IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF NORTH CAROLINA
WESTERN DIVISION
No. 5:08-CV-628-D

| | | |
|---|---|---|
| DANIEL L. SAGER, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | **ORDER** |
| | ) | |
| STANDARD INSURANCE COMPANY, | ) | |
| | ) | |
| Defendant. | ) | |

On December 29, 2008, Daniel L. Sager ("Sager" or "plaintiff") sued Standard Insurance Company ("Standard" or "defendant") in the United States District Court for the Eastern District of North Carolina seeking benefits under his disability insurance policies. Sager alleges that Standard breached its contracts with him and handled his insurance claim in bad faith. On November 3, 2010, Sager and Standard filed cross-motions for summary judgment [D.E. 42, 44]. On December 6, 2010, Sager and Standard filed responses in opposition [D.E. 51, 52]. On December 20, 2010, Sager and Standard replied [D.E. 53, 54]. As explained below, the court grants Standard's motion for summary judgment and denies Sager's motion for summary judgment.

I.

Summary judgment is appropriate when, after reviewing the record taken as a whole, no genuine issue of material fact exists and the moving party is entitled to judgment as a matter of law. Fed. R. Civ. P. 56(a); Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 247–48 (1986). The party seeking summary judgment bears the initial burden of demonstrating the absence of a genuine issue of material fact. Celotex Corp. v. Catrett, 477 U.S. 317, 323 (1986). Once the moving party has met its burden, the nonmoving party may not rest on the allegations or denials in its pleading, Anderson, 477 U.S. at 248–49, but "must come forward with specific facts showing that there is a genuine issue

for trial." Matsushita Elec. Indus. Co. v. Zenith Radio Corp., 475 U.S. 574, 587 (1986) (emphasis removed) (quotation omitted). A trial court reviewing a motion for summary judgment should determine whether a genuine issue of material fact exists for trial. Anderson, 477 U.S. at 249. In making this determination, the court must view the evidence and the inferences drawn therefrom in the light most favorable to the nonmoving party. Scott v. Harris, 550 U.S. 372, 378 (2007).

Sager is insured by Standard under two disability insurance policies. Pl.'s Mem. Supp. Mot. Summ. J., Ex. 1 (hereinafter "Disability Policies").[1] The policies provide Total Disability and Residual Disability coverage benefits, provided Sager meets certain conditions. The policies define "Total Disability" as follows:

Because of Your Injury or Sickness:

1. You are unable to perform the substantial and material duties of Your Regular Occupation; and
2. You are not engaged in any other gainful occupation for which You may become qualified by reason of education, training, or experience; and
3. You are under the regular care of a Physician appropriate for Your Injury or Sickness. This Physician's care requirement will be waived when We receive written proof, satisfactory to Us, that further care would be of no benefit to You.

Id. at 9, 37.[2] The policies define "Residual Disability" as follows:

You are not Totally Disabled, but because of Your Injury or Sickness:

1. Your Monthly Earnings are reduced by 20% or more of Your Indexed Prior Monthly Earnings; and
2. You are under the regular care of a Physician appropriate for Your Injury or Sickness; and
3. You are able:
   a. To do some, but not all, of the substantial and material duties of Your Regular Occupation; or

---

[1] Both policies contain the same language and definitions for "total disability" and "residual disability." See Pl.'s Mem. Supp. Mot. Summ. J. 1. Sager also paid premiums on both policies for "own occupation" and "residual disability" riders. See id. at 3–4. Thus, the two policies are identical in all relevant respects.

[2] Page citations to Sager's disability insurance policies and Sager's claim file are truncated references to the Bates stamp numbering, "STND 1353-XXXXX."

      b. To do all of the substantial and material duties of Your Regular Occupation, but not for as long a time or as effectively as You did immediately prior to Your Injury or Sickness.

Id. at 20, 53. The policies contain a 90-day waiting period before total disability benefits become payable, and the insured must be continuously disabled throughout the 90-day waiting period. See id. at 4, 9, 11, 33, 37, 39. This waiting period also applies to a claim for residual disability benefits. See id. at 20, 53.

Sager is an independent financial consultant. Sager Dep. 59; Pl's Mem. Supp. Mot. Summ. J., Ex. 1 at 59 (Sager's Application for Disability Insurance). Sager contracts with investment companies to solicit and sell their investment products on a commission basis. See Sager Dep. 41–59. Sager's job involves networking, cold-calling, making presentations, attending seminars and social events, and preparing paperwork for clients. Id.; see Pl.'s Mem. Supp. Mot. Summ. J., Ex. 1 at 59. In 2006, Sager was living in Norfolk, Virginia, and working as a financial consultant for Mass Mutual Investor Services ("Mass Mutual"). Sager Dep. 17–18, 50–52. Before and after his injuries, Sager led an active lifestyle, which included mountain biking, playing tennis, golf, and kickball, and running half-marathons and a full marathon. See id. at 19–21.

On June 15, 2006, at age 30, Sager injured his left knee while playing kickball. Id. at 117; Def.'s Mem. Supp. Mot. Summ. J., Ex. 4 at 561 (Carreau Interview); Dr. Brown Dep. 8. An MRI revealed a grade-one sprain of the medial collateral ligament, and partial tears of his anterior cruciate ligament ("ACL") and medial meniscus. Pl.'s Mem. Supp. Mot. Summ. J., Ex. 1 at 671 (hereinafter "Sager Claim File"). On June 22, 2006, Dr. Samuel Brown examined Sager and referred him to a physical therapist to improve his knee mobility and strength. Id. at 667; Dr. Brown Dep. 8–9. On July 13, 2006, Dr. Brown again examined Sager, noted that Sager was making progress in physical therapy, and scheduled an appointment for a "possible final check" for the following month. Sager Claim File 665; see Def.'s Mem. Supp. Mot. Summ. J., Ex. 6 at 98–104 (The Therapy Network

Records, hereinafter "Therapy Records").³ By August 8, 2006, Sager was able to run for 16 minutes at 4 miles per hour during his physical therapy session. Sager Dep. 121; Therapy Records 107. Sager began jogging on his own and reported that he only experienced knee pain when his knee was extended or during "high level activities." See Sager Dep. 122; Therapy Records 108–111. However, in September 2006, Sager reinjured his knee and returned to physical therapy. See Sager Claim File 661; Therapy Records 110–12. In October 2006, Sager again reinjured his left knee while participating in a charity golf event. Sager Claim File 561. Dr. Brown examined Sager and an MRI revealed that Sager had torn the ACL in his left knee. Id. at 659–60. On October 24, 2006, Dr. Brown informed Sager that he would need surgery to repair his ACL and arranged for Sager to receive a knee brace to keep his knee stable until surgery. See id. at 659. Sager told Dr. Brown that he was changing his business and would be relatively free over the next few months. Id.⁴ Sager continued physical therapy until his surgery in December 2006. Id. at 561. Before undergoing knee surgery, Dr. Brown did not place any work restrictions on Sager. See Dr. Brown Dep. 14–30, 38–39; Sager Dep. 145–48; Sager Claim File 561–62, 683–84. In fact, Sager continued working part-time and participated in a seminar in October 2006, but spent most of his time simply trying to "maintain contacts." See Sager Dep. 145–48; Sager Claim File 561–62.

On December 4, 2006, Dr. Brown performed reconstructive surgery to repair Sager's ACL. Dr. Brown Dep. 10; Sager Claim File 561. After the surgery, Dr. Brown recommended that Sager not work. See Dr. Brown Dep. 30. Sager began physical therapy and by January 2007, Sager was off of his crutches and able to resume moderate activity. See Sager Claim File 654–56, 686; Dr.

---

³ Page citations to Sager's physical therapy records are truncated references to the Bates stamp numbering "MED XXXXX."

⁴ Before injuring his knee, Sager had agreed to give up all future rights in his clients in exchange for receiving advance compensation from Mass Mutual. See Sager Dep. 179–80. On October 9, 2006, before the MRI revealed that Sager had torn his ACL, Sager's contract with Mass Mutual was officially terminated. Id. at 187.

4

Brown Dep. 32–34, 39–43. On January 9, 2007, Dr. Brown authorized Sager to resume working between four to six hours a day with certain restrictions. See Brown Dep. 32–35, 39–40. On February 1, 2007, Sager reported that he was walking a half mile to and from the gym and was driving his manual-transmission vehicle without difficulty. Id. at 42–43. On February 6, 2007, Dr. Brown advised Sager that he could return to "sedentary" work anytime, and could do some walking and traveling as needed. Id. at 46–47. On March 20, 2007, Dr. Brown examined Sager and released him to "full duty," which meant that Sager was free to return to work on a full-time basis. Id. at 47–48. Dr. Brown discharged Sager and has not examined or treated Sager since March 20, 2007. Id. at 48–49. Dr. Brown testified that Sager was "quite active" at the time of his discharge, and recalls that "there were really no significant limitations." Id. at 61. Dr. Brown advised Sager that if his pain or symptoms persisted or got worse, he should seek medical care. Id. Sager has not sought or received any treatment for his knee since March 20, 2007. See Sager Dep. 88, 119–20.

On January 18, 2007, Sager submitted a claim for disability insurance benefits for his knee injury. Sager Claim File 567–70. On April 13, 2007, after investigating Sager's claim, Standard informed Sager that he did not qualify for benefits. See id. at 434–42. Standard explained that Sager had not provided satisfactory written proof that he met the policies' definition of disability continuously throughout the 90-day elimination period and beyond. Id. Additionally, Standard noted that it was unable to determine whether Sager's claimed loss of earnings was actually caused by his injury. Id. at 440–41. Standard also informed Sager that it reserved the right to consider and assert other reasons for limiting or denying Sager's claim if, upon further investigation, such reasons were identified. Id. at 442. On May 31, 2007, Sager sent a letter to Standard, appealing the denial of his benefits and responding to Standard's determination. Id. at 476–79. Sager maintained that his disability began when he injured his knee in June 2006, and that it was "only after an intensive rehabilitation [that he] was in a condition to return to the full time duties of travel and sales which accompanies [his] own occupation." Id. at 478. Sager then calculated the 90-day elimination period

5

and informed Standard that he believed he was entitled to residual or total disability benefits from October 2006 until he returned to work in March 2007. Id. Standard considered Sager's letter and additional documentation, but denied Sager's appeal. See id. at 470–71. Standard then referred Sager's claims to the Administrative Review Unit for an independent review. Id. at 470–73. On August 20, 2007, the Administrative Review Unit agreed with Standard's determination, concluded that Sager failed to satisfy the policies' definition of disability and that the medical evidence did not support Sager's claims, and again reserved the right to assert other grounds for limiting or denying Sager's claim upon further investigation. Id.

Sager attempted to return to work in the Spring of 2007, but he was not under contract with any investment companies. Sager Dep. 129. Sager was "pretty tainted" because he filed for personal bankruptcy on November 6, 2006. Id.[5] Sager considered signing a new sales contract with Mass Mutual, but ultimately he decided that Mass Mutual's terms were "too expensive." Id. at 150. Sager attended some networking events, but he was unable to solicit business at those events because he did not have a contract. Id. at 160–61. By August 2007, Sager was still only working in a "limited capacity." Id. at 129.

On August 25, 2007, Sager injured his right shoulder while playing tennis in Virginia Beach, Virginia. Id. at 128–31. On September 10, 2007, Dr. Michael Fajgenbaum examined Sager and took an MRI of Sager's shoulder. Dr. Fajgenbaum Dep. 12, 18–19. The MRI indicated Sager suffered from chronic shoulder problems, but Dr. Fajgenbaum did not find evidence of a new injury. Id. at 13, 21. Sager returned to Dr. Fajgenbaum for another examination in October 2007, complaining of neck pain, numbness, and tingling that extended down to his hand. Id. at 13. Dr. Fajgenbaum

---

[5]Sager had invested money in Bull's Eye Cleaners, but one of the other investors embezzled money from the company. The business declared bankruptcy in 2006. See Sager Dep. 70–71. On November 6, 2006, Sager filed for personal bankruptcy. Id. at 192; Def.'s Mem. Supp. Mot. Summ. J., Ex. 3 (hereinafter "Bankruptcy Petition"). When he declared bankruptcy, Sager had accumulated over $150,000 in personal credit card debt. See Bankruptcy Petition 30–32.

6

took another MRI and referred Sager to a neurosurgeon for his neck pain. Id. at 13–14, 22–23. On January 3, 2008, Dr. Fajgenbaum performed arthroscopic surgery to "clean out" Sager's right shoulder. Id. at 14–15. During the procedure, Dr. Fajgenbaum observed "severe damage to the articular cartilage," which is consistent with osteoarthritis. Id. at 14. After the procedure, Dr. Fajgenbaum instructed Sager to keep his arm in a sling until his follow-up appointment on January 15, 2008. Id. at 24–25. On January 15, 2008, Dr. Fajgenbaum examined Sager and told him that he should begin working to improve his range of motion, but should avoid resistance exercises and lifting weights. Id. On February 12, 2008, Sager returned for another follow-up examination and reported that his shoulder had improved and felt better than it had before the surgery. Id. at 26. After the February 12, 2008 examination, Dr. Fajgenbaum discharged Sager and told him that he should come back as needed if he continued having pain and symptoms. Id. at 27–28, 32. According to Dr. Fajgenbaum, there were several potential treatment options if Sager had returned for further care. Id. at 37–38. Available treatment options included prescription medications, strengthening exercises, steroid injections, and surgical procedures. Id. at 7–8, 38–39, 41. Sager has not sought or received any such treatment for his shoulder.[6] Sager has not seen any other doctors regarding his shoulder injury. Sager Dep. 131.

On March 21, 2008, Sager submitted a claim for disability benefits for his shoulder injury. Sager Claim File 148–53. In his claim, Sager stated that he had returned to work full-time on February 13, 2008 and was working 10 or more hours per day. Id. at 148; Sager Dep. 168–69. Sager claimed that he was able to perform "phone consulta[tions], abbreviated writing, some meetings, [and] curtailed travel," but unable to perform lengthy travel, writing, or typing. See Sager Claim File

---

[6] On December 10, 2008, Dr. Fajgenbaum completed a residual functional capacity assessment in connection with the litigation in this case. See Pl.'s Mem. Supp. Mot. Summ. J. 12. As a part of that assessment, Dr. Fajgenbaum examined Sager's shoulder and noted that his condition was consistent with the cartilage damage and arthritis he had previously seen. Dr. Fajgenbaum Dep. 13–15. Dr. Fajgenbaum has not examined Sager since December 10, 2008. Id. at 29; Sager Dep. 81–82.

7

148. Dr. Fajgenbaum's attending physician statement indicated that Sager was capable of light work, but was limited in the amount of weight that he could lift or carry. Id. at 222.

On July 3, 2008, Standard requested additional information to clarify Sager's work status after February 12, 2008. Id. at 100–01. Sager informed Standard that he was only working part-time and wished to claim residual benefits starting on February 12, 2008. Id. On July 18, 2008, Standard approved payment of $13,387.00 for Sager's shoulder injury. See id. 98–102. Standard determined that Sager became totally disabled on August 25, 2007, the day he injured his shoulder playing tennis, and that he remained totally disabled until February 12, 2008, when Sager's claim form indicated he returned to full-time employment. Id. Standard concluded that Sager's permanent limitations, which involve significant overhead use of his right shoulder or heavy lifting, did not impact Sager's ability to perform his job as a financial planner. Id. at 100–01. Standard found no medical "documentation to support any specific limitations regarding driving, computer use or writing." Id. Standard explained that "having or being treated for a medical condition does not necessarily constitute [a] disability." Id. at 101. Finally, Standard informed Sager that he had not provided any medical documentation or the appropriate financial records to show that he met the definition for residual disability after February 12, 2008. Id. at 100–01. Standard again reserved its right to assert other grounds for denying or limiting Sager's claim if, upon further investigation, such grounds were brought to light. Id. at 102.

In December 2007, Sager entered a contract with Allstate Financial Services to work as a financial planner. Sager Dep. 60. Sager returned to work in February 2008, but he was forced to start a "brand new network" because his work as a financial advisor was "relationship-driven" and he had moved to Raleigh, North Carolina after his shoulder injury. See id. at 133–34.[7] Sager claims that his shoulder injury initially limited his ability to drive a car because he "couldn't shift the gears,"

---

[7] Before injuring his knee in the Summer of 2006, Sager gave up all future rights in his clients in exchange for advanced compensation from Mass Mutual. Sager Dep. 179–81.

8

and that even after he got an automatic-transmission vehicle, he still has trouble turning or keeping both hands on the wheel. Id. at 134–35.

Sager maintains that his left knee and right shoulder injuries currently limit his ability to work as a financial planner. Id. at 78–88. Sager claims that the injuries impact his financial planning because they hurt his confidence and also cause discomfort, such as "general achiness, general soreness, [and] infrequent shooting pains," which limits his ability to drive long distances or write for long periods of time. Id. at 79–80, 83, 124. According to Sager, his injuries are also "a major hindrance to getting dressed" and even require him to be "cognizant of handshaking," because if he "shake[s] somebody's hand the wrong way, it could trigger an irritation that could be debilitating." Id. at 82.

Although Sager claims that his injuries limit his ability to work as a financial planner, Sager has resumed an otherwise active lifestyle. In fact, in the Spring of 2008, Sager began training to run a half marathon. Id. at 131. Over the 2008 Labor Day weekend, Sager ran the Rock-n-Roll Half Marathon in approximately two hours and forty minutes. Id. 19, 117. Sager also plays golf, rides mountain bikes, and has gone hunting and camping since recovering from his injuries. Id. at 21–22, 25–26.

On December 29, 2008, Sager filed this action against Standard. Sager alleges breach of contract and bad faith handling of an insurance claim. Sager claims that he is entitled to total disability and residual disability benefits for both his knee and shoulder injuries. Sager claims he is residually disabled and seeks disability benefits from June 16, 2006, to the present. Pl.'s Mem. Supp. Mot. Summ. J. 3. Sager also seeks total disability benefits, but he does not identify the time period for which he claims he was totally disabled. See id.; Compl. ¶¶ 6–18. Sager and Standard have filed cross-motions for summary judgment. Sager argues that he is entitled to summary judgment on his residual disability claim and claim for bad faith handling of an insurance claim. Pl.'s Mem. Supp. Mot. Summ. J. 3. Standard disputes whether Sager was disabled throughout the

9

90-day waiting period for his knee injury and whether his alleged disabilities actually caused his lost income. Def's Mem. Supp. Mot. Summ. J. 2–6. In support of the causation argument, Standard cites (among other things) Sager's November 2006 personal bankruptcy and his decision to change his business in 2006. See id. Standard seeks summary judgment on Sager's claim for any disability benefits after March 20, 2007, because Sager has not been under the regular care of a physician for his knee injury since March 20, 2007, or his shoulder injury since February 12, 2008. See id. at 1–2. Standard also argues that it is entitled to summary judgment on Sager's claim for any disability benefits before March 4, 2007. Id. at 20–21.[8] Finally, Standard seeks summary judgment on Sager's claim for bad faith handling of an insurance claim. Id. at 18–20.

II.

When federal jurisdiction is based on diversity, a court must apply the choice-of-law rules of the state in which it sits. Klaxon Co. v. Stentor Elec. Mfg. Co., 313 U.S. 487, 496–97 (1941); Am. Online, Inc. v. St. Paul Mercury Ins. Co., 347 F.3d 89, 92 (4th Cir. 2003). Under North Carolina's choice-of-law rules, "a contract is governed by the law of the place where the contract was made." Tanglewood Land Co. v. Byrd, 299 N.C. 260, 262, 261 S.E.2d 655, 656 (1980); see N.C. Farm Bureau Mut. Ins. Co. v. Sadler, 711 S.E.2d 114, 117 (N.C. 2011) ("We first note the well-settled principle that an insurance policy is a contract"). Typically, the last act required to make a binding contract is delivery of the policy. Fortune Ins. Co. v. Owens, 351 N.C. 424, 428, 526 S.E.2d 463, 466 (2000); SPX Corp. v. Liberty Mut. Ins. Co., 709 S.E.2d 441, 448 (N.C. Ct. App. 2011). The parties agree that Virginia law applies because Sager's policies were delivered in Virginia.

A party seeking to recover under an insurance policy bears the burden of proving the right to recover under the policy. See, e.g., Estate of Mohamed v. Monumental Life Ins. Co., 138 F. Supp. 2d 709, 719–20 (E.D. Va. 2001); Aetna Cas. & Sur. Co. v. Harris, 218 Va. 571, 578, 239 S.E.2d 84,

---

[8]Standard does not seek summary judgment concerning Sager's disability claim for residual disability benefits starting on March 4, 2007, and ending on March 20, 2007. See Def.'s Reply 11–12.

88 (1977). In order to establish coverage, a plaintiff first must meet any conditions precedent to coverage. See, e.g., Estate of Mohamed, 138 F. Supp. 2d at 719–20; Craig v. Dye, 259 Va. 533, 537, 526 S.E.2d 9, 12 (2000); State Farm Fire & Cas. Co. v. Walton, 244 Va. 498, 504, 423 S.E.2d 188, 192 (1992). The plaintiff must prove the right to recover by a preponderance of the evidence. Estate of Mohamed, 138 F. Supp. 2d at 719–20.

Under Virginia law, the interpretation of a contract is a question of law. City of Chesapeake v. States Self-Insurers Risk Retention Group, Inc., 271 Va. 574, 578, 628 S.E.2d 539, 541 (2006). Absent ambiguity, Virginia courts construe the terms of a contract according to their plain meaning. See, e.g., Lyon v. Paul Revere Life Ins. Co., 289 F. Supp. 2d 740, 743 (W.D. Va. 2002) (collecting cases); City of Chesapeake, 271 Va. at 578, 628 S.E.2d at 541; State Farm, 244 Va. at 502, 423 S.E.2d at 191.

A.

In order to meet the policies' definition of "Total Disability," Sager must show that because of his injury:

1. [He is] unable to perform the substantial and material duties of [his] Regular Occupation; **and**
2. [He is] not engaged in any other gainful occupation for which [he] may become qualified by reason of education, training, or experience; **and**
3. **[He is] under the regular care of a Physician appropriate for [his] Injury or Sickness.** This Physician's care requirement will be waived when [Standard] receive[s] written proof, satisfactory to [Standard], that further care would be of no benefit to [him].

Disability Policies 9, 37 (emphasis added). In order to meet the policies' definition of "Residual Disability," Sager must show that he is not totally disabled, but because of his injury:

1. [His] Monthly Earnings are reduced by 20% or more of [his] Indexed Prior Monthly Earnings; **and**
2. **[He is] under the regular care of a Physician appropriate for [his] Injury or Sickness; and**
3. [He is] able:
    a. To do some, but not all, of the substantial and material duties of [his] Regular Occupation; or

11

> b. To do all of the substantial and material duties of [his] Regular Occupation, but not for as long a time or as effectively as [he] did immediately prior to [his] Injury or Sickness.

Id. at 20, 53 (emphasis added). The language in the policies is clear and unambiguous. See Reznick v. Provident Life & Accident Ins. Co., 364 F. Supp. 2d 635, 637–38 (E.D. Mich. 2005). In order to meet the definition of total disability or residual disability, Sager was required to be "under the regular care of a physician appropriate for [his] injury."

Policy provisions requiring an insured to be under a physician's care are enforceable conditions precedent to coverage. See, e.g., Heller v. Equitable Life Assurance Soc'y of U.S., 833 F.2d 1253, 1257 (7th Cir. 1987); Bakal v. Paul Revere Life Ins. Co., 576 F. Supp. 2d 889, 900–01 (N.D. Ill. 2008); Mack v. Unum Life Ins. Co. of Am., 471 F. Supp. 2d 1285, 1289–91 (S.D. Fla. 2007); Reznick, 364 F. Supp. 2d at 638; Stinnett v. Nw. Mut. Life Ins. Co., 101 F. Supp. 2d 720, 723 (S.D. Ind. 2000). A physician's care provision obliges an insured to seek and accept appropriate medical care. See, e.g., Heller, 833 F.2d at 1257; Mack, 471 F. Supp. 2d at 1290–91; Reznick, 364 F. Supp. 2d at 638. An insured's failure to comply with such a provision will prevent an insured from satisfying the contractual requirement. See Bakal, 576 F. Supp. 2d at 900–01; Mack, 471 F. Supp. 2d at 1290–91.

The requirement serves several important purposes. It enables the insurer "to determine that the claimant is actually disabled, is not malingering, and to prevent fraudulent claims." Heller, 833 F.2d at 1257 (citation omitted); see Bakal, 576 F. Supp. 2d at 901; Stinnett, 101 F. Supp. 2d at 725. Furthermore, the requirement minimizes the insurer's loss in cases where the insured's disability can benefit from a physician's care. Bakal, 576 F. Supp. 2d at 901; Stinnett, 101 F. Supp. 2d at 725–26. Of course, the physician's care requirement does not permit the insurer to determine the insured's course of treatment. See Heller, 833 F.2d at 1257. However, the provision does require some continuity of treatment. See Bakal, 576 F. Supp. 2d at 901; May v. Nat'l Life Ins. Co., No. 96 C 616, 1997 WL 461085, at *6 (N.D. Ill. Aug. 8, 1997) (unpublished).

12

As for Sager's knee injury, the undisputed evidence shows that Dr. Brown discharged Sager from his care on March 20, 2007, and Dr. Brown has not treated him since that date. Dr. Brown Dep. 48–49. Dr. Brown advised Sager that if his pain or symptoms persisted or got worse, he should seek medical care. Id. at 61. Sager admits that he has not sought or received any medical care for his knee from Dr. Brown or any other doctor. Sager Dep. 88, 119–20. As a result, Sager ceased to be under the regular care of a physician for his knee injury on March 20, 2007. See Bakal, 576 F. Supp. 2d at 900–01; Mack, 471 F. Supp. 2d at 1289–90. There is no evidence in the record that Standard waived the physician's care requirement. Therefore, Sager cannot meet the policies' definition for total disability or residual disability for his knee after March 20, 2007.

As for Sager's shoulder injury, the undisputed evidence shows that Dr. Fajgenbaum discharged Sager from his care on February 12, 2008. Dr. Fajgenbaum Dep. 27–28, 32. The only time Dr. Fajgenbaum has examined Sager since that date was on December 10, 2008, during the course of discovery in this case, when Dr. Fajgenbaum completed a residual functional capacity assessment. See id. at 15; Pl.'s Mem. Supp. Mot. Summ. J. 12. As a result, Sager ceased to be under the regular care of a physician for his shoulder injury on February 12, 2008. See Bakal, 576 F. Supp. 2d at 900–01; Mack, 471 F. Supp. 2d at 1289–90. Again, there is no evidence in the record that Standard waived the physician's care requirement. Accordingly, Sager cannot meet the policies' definition for total disability or residual disability for his shoulder after February 12, 2008.

Sager offers two arguments in opposition. First, Sager claims that he is still under the care of his doctors because the doctors simply told him to come back as needed. Pl.'s Opp'n Def.'s Mot. Summ. J. 8–9, 14–15; Pl.'s Reply 5–6. Dr. Brown has not examined or treated Sager's knee for over 53 months. Likewise, Dr. Fajgenbaum discharged Sager over 42 months ago, and has examined Sager only once since February 12, 2008. No reasonable jury could find that Sager is under the regular care of Dr. Brown or Dr. Fajgenbaum. See Bakal, 576 F. Supp. 2d at 900–01 ("Simply put, no physician was attending to or caring for Bakal's disability for the approximately sixteen-month

13

period"); Mack, 471 F. Supp. 2d at 1291–92 (granting summary judgment to insurer for two sixteen-month periods and an eighteen-month period where insured failed to seek medical care); Stinnett, 101 F. Supp. 2d at 725–26 (granting summary judgment to insurer for twenty-month period where insured failed to seek medical care). Sager's proposed interpretation is "beyond any liberal reading of the requirement in question, [and] border[s] on the realm of the absurd." Mack, 471 F. Supp. 2d at 1290. Moreover, even if Sager somehow were still under the care of Drs. Brown and Fajgenbaum, Sager clearly failed to follow their instructions to return if his pain or symptoms persisted. See Dr. Brown Dep. 48–49; Dr. Fajgenbaum Dep. 27. Sager has not returned for further treatment, despite his testimony that his pain and symptoms have persisted. Thus, Sager failed to seek and accept appropriate medical care. See Bakal, 576 F. Supp. 2d at 901; Stinnett, 101 F. Supp. 2d at 725–26.[9]

Second, Sager relies on the "mend the hold" doctrine to argue that Standard cannot deny coverage based on the physician's care requirement because Standard never previously raised it as a ground for denying coverage. Pl.'s Opp'n Def.'s Mot. Summ. J. 7–8, 15. The "mend the hold" doctrine is an equitable doctrine that limits the right of a party to a contract to change its litigating position concerning the contract's meaning during the course of the litigation. See, e.g., Harbor Ins. Co. v. Continental Bank Corp., 922 F.2d 357, 362–65 (7th Cir. 1990) (discussing the doctrine's development in Illinois law, but also noting the doctrine's uncertain reach); see also Strategic Outsourcing, Inc. v. Continental Cas. Co., 274 Fed. Appx. 228, 238 (4th Cir. 2008) (per curiam) (unpublished). Notably, Sager does not cite any Virginia precedent adopting, applying, or discussing the "mend the hold" doctrine. The court need not, however, decide whether Virginia would adopt it. Rather, even if the court assumes, without deciding, that the Virginia Supreme Court would adopt the doctrine, the doctrine does not apply to this case for several reasons. First, Sager's disability claim for his knee injury only sought disability benefits through March 20, 2007, when

---

[9] For example, Dr. Fajgenbaum testified that he does not know what complaints or symptoms (if any) Sager is experiencing or what treatment options might help Sager's condition. Dr. Fajgenbaum Dep. 37–39.

Sager claimed he returned to work. See Sager Claim File 476–79. Logically, if Sager's did not seek disability benefits concerning his knee injury after March 20, 2007, Standard never issued a denial of such benefits (for any reason). Moreover, because Sager's disability claim for his knee injury did not seek benefits after March 20, 2007, Standard had no reason to investigate whether Sager remained under Dr. Brown's care. Cf. Harbor, 922 F.2d at 364–65 (noting that the "mend the hold" doctrine does not bar a change in position based on the discovery of new information). Second, Standard's denial of Sager's disability claim for his shoulder injury specifically noted the lack of medical documentation after February 12, 2008. See Sager Claim File 100–01. Thus, the revelation that Sager did not continue under the care of a physician for his injury justifies Standard's change in position. See Harbor, 922 F.2d at 364. Finally, Standard's denial letters expressly reserved its right to assert other grounds for limiting or denying coverage, if upon further investigation, such grounds came to light. See City of Burlington v. Hartford Steam Boiler Inspection & Ins. Co., 190 F. Supp. 2d 663, 681 (D. Vt. 2002) (noting that, under Vermont law, the "mend the hold" doctrine does not apply when the insurer's original denial reserves the right to assert other grounds). Thus, the "mend the hold" doctrine provides no comfort to Sager.

In sum, Sager cannot satisfy the physician's care requirement from March 21, 2007, to the present. Therefore, Standard is entitled to summary judgment on Sager's claims for disability benefits for that time period.

B.

As for Sager's claim for disability benefits before March 4, 2007, Standard is entitled to summary judgment. Sager claims that he became disabled when he injured his knee playing kickball on June 15, 2006. See Sager Dep. 117–19, 123. However, simply having or being treated for a medical condition does not constitute total or residual disability under the policies. See Disability Policies 9, 20, 37, 53 (defining total disability and residual disability). Moreover, the policies contain a 90-day waiting period before total disability or residual disability benefits become

15

payable, and the insured must be continuously disabled throughout the 90-day waiting period. See Disability Policies 4, 9, 11, 20, 33, 37, 39, 53.

Here, no medical evidence supports Sager's claim that he was continuously disabled before his surgery on December 4, 2006. In fact, the available evidence contradicts Sager's claim. Sager began physical therapy after he injured his knee on June 15, 2006. Sager's condition eventually improved to the point that he was able to jog to and from his physical therapy sessions and ran a mile during his August 8th physical therapy session. Moreover, Sager continued working, at least part-time, before he underwent surgery. See Sager Claim File 561–62; Sager Dep. 146, 148. Furthermore, Dr. Brown testified that, before Sager's surgery on December 4, 2006, he did not place any medical or work restrictions on Sager. See Dr. Brown Dep. 14–30, 38–39. It was only after Sager's surgery that Dr. Brown recommended any medical restrictions, because it was "at this point [that Sager] was disabled, slightly disabled as a result of his surgery." Id. at 30. Thus, Sager was not under any disability until December 4, 2006.

The policies also exclude the 90-day waiting period, from December 4, 2006 to March 3, 2007, before benefits become payable. Accordingly, Sager cannot recover disability benefits for this time period, and the court grants Standard summary judgment on Sager's claim for disability benefits before March 4, 2007.

III.

Standard is also entitled to summary judgment on Sager's claim for bad faith handling of an insurance claim. Under Virginia law, an insured has a statutory right to recover attorney's fees and costs

> in any civil case in which an insured individual sues his insurer to determine what coverage, if any, exists under his present policy . . . or the extent to which his insurer is liable for compensating a covered loss . . . . [if] the court determines that the insurer, not acting in good faith, has either denied coverage or failed or refused to make payment to the insured under the policy.

16

Va. Code Ann. § 38.2-209. The statute serves two purposes: it is designed to punish an insurer's bad faith handling of a claim and reimburse an insured who is compelled by the insurer's bad faith to incur the expense of litigation. CUNA Mut. Ins. Soc'y v. Norman, 237 Va. 33, 38, 375 S.E.2d 724, 726–27 (1989). However, the statute does not create an independent cause of action. A party "may seek relief under Section 38.2-209 only after a judgment is entered against the insurer." Tiger Fibers, LLC v. Aspen Specialty Ins. Co., 594 F. Supp. 2d 630, 654 (E.D. Va. 2009) (collecting cases). As a result, "a judgment against the insurer acts as a condition precedent to any claim of bad faith in Virginia." U.S. Airways, Inc. v. Commonwealth Ins. Co., No. 03-587, 64 Va. Cir. 408, 2004 WL 1094684, at *9 (Va. Cir. Ct. May 14, 2004) (unpublished); see Tiger Fibers, 594 F. Supp. 2d at 654–55. Therefore, Sager's motion for summary judgment fails because judgment has not been entered against Standard.

Courts apply a reasonableness standard to the insurer's conduct and consider a range of factors, which include:

> whether reasonable minds could differ in the interpretation of policy provisions defining coverage and exclusions; whether the insurer had made a reasonable investigation of the facts and circumstances underlying the insured's claim; whether the evidence discovered reasonably supports a denial of liability; whether it appears that the insurer's refusal to pay was used merely as a tool in settlement negotiations; and whether the defense the insurer asserts at trial raises an issue of first impression or a reasonably debatable question of law or fact.

CUNA, 237 Va. at 38–39, 375 S.E.2d at 726–27; see Tiger Fibers, 594 F. Supp. 2d at 654–55; Carolina Cas. Ins. Co. v. Draper & Goldberg, PLLC, 369 F. Supp. 2d 667, 672–75 (E.D. Va. 2004). An insured's claim fails as a matter of law if the court finds the issue of coverage is "reasonably debatable." CUNA, 237 Va. at 38–39, 375 S.E.2d at 727.

As explained, Sager is not entitled to recover disability benefits for the time period before March 4, 2007, or after March 20, 2007. As for the period between March 4, 2007, and March 20, 2007, the court does not find any evidence of bad faith and concludes that the claim fails on the merits. Cf. Tiger Fibers, 594 F. Supp. 2d at 655. Dr. Brown noted that by February 2007, Sager

17

was able to return to "sedentary" work, and could do some walking and traveling as needed. Dr. Brown Dep. 46–47. Standard engaged in a reasonable investigation and review of Sager's claim. See, e.g., Def.'s Mem. Supp. Mot. Summ. J., Exs. 4 (Carreau Interview), 12–14 (Physician Consultation Reports), 17–18 (Standard's Letters Explaining Benefits Determination). Standard concluded that Sager "would have been precluded from returning to work for 4 to 8 weeks" after surgery, but that he would have been able to resume work before the end of the 90-day elimination period. See Sager Claim File 471. Based on a review of the entire record, the court finds the issue of coverage during this time period "reasonably debatable." See CUNA, 237 Va. at 38–39, 375 S.E.2d at 727. Therefore, Standard is entitled to summary judgment on Sager's claim for bad faith handling of an insurance claim.

IV.

As explained above, Standard's motion for summary judgment [D.E. 42] is GRANTED. Sager's motion for summary judgment [D.E. 44] is DENIED. Sager's sole remaining claim is for residual disability benefits from March 4, 2007 to March 20, 2007. Absent the ability to resolve the issue associated with such residual disability benefits for the period from March 4, 2007, to March 20, 2007, the parties shall schedule and complete mediation by September 28, 2011. The parties shall provide the court a status update on September 29, 2011.

SO ORDERED. This 26 day of August 2011.

JAMES C. DEVER III
United States District Judge